# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

SHERIDAN'S FRANCHISE SYSTEMS,
INC.,

*Plaintiff*,

vs.

Case No.10-2272-EFM

MARK GOLDENBERG, et al.,

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiff Sheridan's Franchise Systems, Inc., is a Kansas corporation with its principal place of business in Kansas. Plaintiff is the franchisor for a number of frozen custard franchises located throughout the United States. Defendant Mark Goldenberg is a franchisee operating a Sheridan's Frozen Custard restaurant in Henderson, Nevada under the name Sheridan's of Henderson. After operating this store for a number of years, Goldenberg entered into an agreement to sell the building and assets of the business to Defendant Mr. D., L.L.C. ("Mr. D's"), a Nevada limited liability company with it principal place of business in Nevada. The only members of Mr. D's are its managing partners, Defendants Richard Dyke and Yung Edwards, each citizens of Nevada. Plaintiff claims that by selling the business and its assets, Goldenberg violated the Franchise Agreement, damaging Plaintiff. In addition, Plaintiff alleges that Mr. D's, through its managing partners, Defendants Dyke and Edwards, conspired with Goldenberg to interfere with the Franchise

Agreement and damage Plaintiff. Defendants Mr. D's, Dyke, and Edwards now move the Court to dismiss all of Plaintiff's claims against them for lack of personal jurisdiction.

On June 15, 2010, the instant motion came on for hearing, in which the Court heard argument along with the testimony of Dyke and Goldenberg.[1] After hearing the testimony and arguments presented during the hearing, and after reviewing the briefing submitted by the parties, the Court denies the motion.[2]

**Analysis**

A plaintiff opposing a motion to dismiss based on lack of personal jurisdiction bears the burden of showing that personal jurisdiction over the defendant is appropriate.[3] In a pre-trial motion to dismiss, such as when the matter is decided on the basis of affidavits and written materials, the plaintiff is only required to make a prima facie showing that personal jurisdiction is proper to avoid dismissal.[4] Once the plaintiff makes a prima facie showing, the defendant must "present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'"[5] However, when personal jurisdiction is assessed in an evidentiary

---

[1] Defendants Mr. D's, Dyke, and Edwards appeared for the limited purpose of challenging personal jurisdiction. Defendant Goldenberg was present in the courtroom with his counsel, Kevin J. Breer of Polsinelli Shughart PC; however, Goldenberg was present as a defendant's witness and was not a party to the instant motion.

[2] The Court also issued a preliminary ruling on the record at the conclusion of the evidentiary hearing.

[3] *Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227 (D. Kan. 2000) (citing *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996)).

[4] *Id.*

[5] *Id.* at 1227 (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985))).

hearing or at trial, the plaintiff must generally establish by a preponderance of the evidence that personal jurisdiction exists.[6]

As this is a diversity of citizenship action, personal jurisdiction is determined by the law of the forum state, and must comport to that state's long-arm statute and ensure that constitutional due process is satisfied.[7] Because neither Goldenberg nor Defendant Sheridan's of Henderson, Inc. (collectively the "Goldenberg Defendants") challenges personal jurisdiction, the Court limits its analysis to Defendants Mr. D's, Dyke, and Edwards (collectively the "Mr. D's Defendants").[8]

**1. Kansas Long-Arm Statute**

The Kansas long-arm statute provides in part, that:

Any person, whether or not a citizen or resident of this state, who *in person or through an agent or instrumentality* does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

Transaction of any business within this state; [or]

commission of a tortious act within this state.[9]

The "agent or instrumentality" language of the Kansas long-arm has been interpreted broadly so as to include those non-resident defendants who control or direct acts of the agent from which

---

[6]*Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1069-70 (10th Cir. 2008).

[7]*Thermal Components*, 98 F. Supp. 2d at 1227 (citing *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1304 (10th Cir. 1994)). "Because the Kansas long-arm statute is construed liberally so as to allow jurisdiction to the full extent permitted by due process," separate long-arm and due process analysis is duplicative and unnecessary, and therefore, a court may proceed directly to the constitutional due process analysis. *Federated Rural*, 17 F.3d at 1305. Nevertheless, the Court will evaluate Defendants' conduct to ensure that it falls within the scope of Kansas' long-arm statute.

[8]The Court will collectively refer to the Goldenberg Defendants and the Mr. D's Defendants as "Defendants."

[9]K.S.A. § 60-308(b)(1)(A)-(B).

the claim arises, or who "purposefully seek[ ] and foreseeably benefit[ ] from [an] active relationship with another entity that has transacted business in the forum that gives rise to [the] claim."[10]

Plaintiff alleges that personal jurisdiction against the Mr. D's Defendants is proper under the Kansas long-arm statute because they conspired with Goldenberg to breach the Franchise Agreement and tortiously interfered with that contract, and that the Mr. D's Defendants benefitted from that conduct. Plaintiff contends that as a result of the Mr. D's Defendants' actions, it was reasonably foreseeable that Plaintiff's injury would be felt in Kansas.

The Court agrees that the Mr. D's Defendants are subject to jurisdiction under the tortious act provision of Kansas' long-arm. Although the Mr. D's Defendants argue that Plaintiff's injury was to its franchise location in Nevada and not Kansas, Plaintiff's injury, alleged to be caused by all Defendants' concerted conduct, was suffered by Plaintiff at its principal place of business in Kansas.[11] Accordingly, for purposes of Kansas' long-arm, Plaintiff's injury occurred in Kansas, and therefore, jurisdiction over the Mr. D's Defendants is proper.[12]

**2. Due Process**

Having determined that the Mr. D's Defendants' conduct falls within the Kansas long-arm statute, the Court must next determine whether the exercise of jurisdiction offends the constitutional guarantee of due process. This inquiry begins by determining whether the defendant challenging

---

[10] *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F. Supp. 483, 514 (D. Kan. 1978).

[11] *Thermal Components*, 98 F. Supp. 2d at 1228; *see also Corinthian Mortgage Corp. v. First Security Mortgage Co.*, 716 F. Supp. 527, 529 (D. Kan. 1989) (stating "[u]nder Kansas law, even though a tortfeasor acts outside the state, a tort occurs in Kansas for purposes of long-arm jurisdiction if the act "cause[s] tortious injury to a resident in the state...." (quoting *Wegerer v. First Commodity Corp.*, 744 F.2d 719, 727-28 (10th Cir. 1984)).

[12] *See Brooke Credit Corp. v. Texas Am. Insurers, Inc. et. al.*, 2007 WL 1586082, at * 5 (D. Kan. May 31, 2007) (citing *Merriman v. Crompton Corp.*, 282 Kan. 433, 146 P.3d 162 (2006)) (recognizing the Kansas Supreme Court's conclusion that a "theory of conspiracy jurisdiction can be used to satisfy due process considerations.").

jurisdiction has such minimum contacts with the forum state that he should reasonably anticipate that he might be required to defend himself in that state.[13] A court may find that a non-resident defendant has sufficient minimum contacts with the forum state and assert specific jurisdiction where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or are related to those activities."[14] Where no nexus exists between the forum-related activity and the injury sustained, the court may nevertheless exercise general jurisdiction over the defendant when the defendant's contacts "are so pervasive that personal jurisdiction is conferred by the 'continuous and systematic' nature of the defendant's in-state activities."[15] Because Plaintiff does not allege that the Mr. D's Defendants have such "continuous and systematic" contacts to subject them to general jurisdiction, the Court addresses specific jurisdiction only.

To exercise specific jurisdiction over a non-resident defendant, the Court must first determine whether the defendant has such "minimum contacts" with the forum state "that he should reasonably anticipate being haled into court there."[16] The Court must then consider whether exercise of jurisdiction is reasonable such that it does not offend the "traditional notion of fair play and substantial justice."[17] This inquiry requires the Court to determine "whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is reasonable in light of

---

[13]*OMI Holdings*, 149 F.3d at 1091.

[14]*Id.* at 1090-91 (quoting *Burger King*, 471 U.S. at 472; *Asahi Metals Indus. Co. v. Superior Court*, 480 U.S. 102, 109 (1987)).

[15]*Id.*

[16]*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[17]*Asahi Metals*, 480 U.S. at 113.

the circumstances surrounding the case."[18] Although the minimum contacts and reasonableness components are distinct with respect to our due process analysis, "an interplay exists between [the two], such that, depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry," suggesting that the reasonableness prong evokes a sliding scale.[19]

### *a. Minimum Contacts*

The minimum contacts standard requires (1) that the non-resident defendant "purposefully directed" its activities at residents of the forum state, and (2) that the plaintiff's injuries "arise out of" the defendant's forum related activities.[20] This "purposeful direction" is required so that the non-resident defendant will not be forced to defend a claim in which its contacts with that non-resident forum are merely "random, fortuitous, or attenuated."[21]

Purposeful direction exists if a defendant engages in (a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state.[22] While the mere foreseeability of causing injury in the forum state, standing alone, is insufficient to warrant the exercise of personal jurisdiction over a defendant,[23] "actions that are

---

[18]*OMI Holdings*, 149 F.3d at 1091.

[19]*Id.* at 1091-92 (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)).

[20]*Burger King*, 471 U.S. at 472; *Dudnikov*, 514 F.3d at 1071.

[21]*Burger King*, 471 U.S. at 472; *Dudnikov*, 514 F.3d at 1071.

[22]*Dudnikov*, 514 F.3d at 1072 (citing *Calder v. Jones*, 465 U.S. 783 (1984)).

[23]*Guang Dong Light Headgear Factory Co. Ltd. v. ACI Int'l, Inc.*, 2007 WL 1341699, at *5 (D. Kan. May 4, 2007) (citing *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995)).

performed for the very purpose of having their consequences felt in the forum state are more than sufficient to support a finding of purposeful direction."[24]

Plaintiff argues that the Mr. D's Defendants satisfy the minimum contact requirements because they purposefully directed their tortious conduct at Kansas through their knowing and intentional interference with Plaintiff's and the Goldenberg Defendants' Franchise Agreement. In addition, Plaintiff asserts that Defendants conspired to misappropriate Plaintiff's confidential trade secrets and trade dress in an effort to obtain a competitive advantage over Plaintiff. In support, Plaintiff relies on the language of Defendants' Asset Purchase Agreement ("Purchase Agreement"), wherein items that were part of the purchase included, among other things, the seller's information required to operate the business, goodwill, vendor lists, an agreement not to compete, franchise agreements, employee lists, all customer and client lists, and all business equipment and machinery.[25] In addition, Plaintiff argues that as a contingency to the Purchase Agreement, the Mr. D's Defendants required that before closing, they be satisfied that no issues remained with regards to Plaintiff's right of first refusal. The Mr. D's Defendants further required that after closing, Goldenberg continue to work at the store for at least 30 days to train the Mr. D's Defendants and their employees at the restaurant. In fact, Plaintiff argues that the Mr. D's Defendants retained some of Goldenberg's employees who were knowledgeable of Plaintiff's proprietary systems to work in their new restaurant. The Mr. D's Defendants also maintained the same menu, and even told customers upon inquiry that their store served the same product as before, but merely under a

---

[24]*See Calder*, 465 U.S. at 789; *see also Dudnikov*, 514 F.3d at 1078; *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1358 (10th Cir. 1990) (stating that "if a defendant's actions cause foreseeable injuries in another state, it is, 'at the very least, presumptively reasonable for the defendant to be called to account there for such injury.'").

[25]Doc. 26-1, p.3 ¶ 22 (Asset Purchase Agreement).

different name. Plaintiff contends that the Purchase Agreement, along with all the circumstances surrounding the sale, is sufficient evidence establishing that the Mr. D's Defendants were buying the business and that they knew the business was covered by a franchise agreement between Plaintiff and the Goldenberg Defendants. Plaintiff suggests that because the Mr. D's Defendants knew the business was covered by a franchise agreement,[26] and continued in a concerted effort with the Goldenberg Defendants to interfere with the contract to deprive Plaintiff of its rights under that agreement, personal jurisdiction is proper.

At the June 15th hearing, both Dyke and Goldenberg testified on behalf of the Mr. D's Defendants. Summarized, Dyke testified that he had no intention of buying a business, but instead, was simply purchasing the physical assets of Goldenberg's business, specifically the building and equipment. Dyke stated that while the Purchase Agreement contains certain provisions referring to a franchise and other intangible business assets, such as goodwill and customer lists, these sections were simply boilerplate language that were included by the real estate broker to which he just accepted.

Dyke testified that while he was aware that a franchise agreement existed between Goldenberg and Plaintiff, he has never read it nor has he ever been provided a copy. He denied conducting any research to determine Plaintiff's location, and specifically denied having any knowledge that Plaintiff was a Kansas corporation with its headquarters in Kansas. He further testified that he had no idea where Goldenberg's franchisor was located. Dyke further explained that while the Purchase Agreement contained language referring to a franchise, he never executed a

---

[26]Even if, as the Mr. D's Defendants argue, they did not know the specific provisions of the Franchise Agreement, it is clear that they knew its provisions could affect the contemplated sale but structured the sale to avoid them.

franchise addendum or applied for a franchise with Plaintiff because he had no desire to run a franchise. He stated that the purpose for the contingency requiring Goldenberg to work for 30 days in the store for training was simply to learn how to operate the purchased machinery and was not intended to provide Defendants training on any of Plaintiff's proprietary processes. Nevertheless, Dyke testified that Goldenberg never actually provided training, and in fact, he released that contingency because he determined that running a custard store was a simple operation that did not require any such training. Dyke did testify, however, that while he removed the "Sheridan's" name from the business, he maintained the same menu board, the same menu items, the same slogan, and the same cups to serve his product as Goldenberg used when operating the store.[27] Dyke stated that he believed these items were common to all custard restaurants and was not part of any proprietary claim.

Dyke's testimony that he was simply purchasing assets and not a business is simply not credible. The Purchase Agreement was clearly for a frozen custard business, and Dyke both planned to and continued to operate such a business. Dyke is clearly a sophisticated businessman who has been a party to two other franchise agreements in past years and has prior to this transaction purchased and sold other companies. The Purchase Agreement undoubtedly contemplates the purchase of more than tangible assets, and the Mr. D's Defendants' arguments that other forms would have been used if a business was to be purchased are simply incredible on their face. The Purchase Agreement contained a non-compete agreement, provided for sale of intangible business assets, and provided for the sale of business inventory, including Plaintiff's proprietary custard mix,

---

[27] Goldenberg testified that as part of the sale, he sold the inventory that remained, which included Plaintiff's proprietary custard mix, which Dyke also testified he knew was a proprietary item, and product cups received from Plaintiff.

which is the same product Goldenberg used in operating his business. The Mr. D's Defendants further conducted an extensive review of Goldenberg's financial statements, and was present in the store for two weeks prior to the sale to verify income generated from Goldenberg's operation of the business. While the circumstances surrounding the sale do not indicate that the Mr. D's Defendants ever intended to purchase the franchise itself, the Court concludes that they intended, and ultimately did, purchase the business, and Dyke's and Goldenberg's testimony to the contrary simply lacks credibility.[28]

Although we conclude that the evidence supports a finding that the Mr. D's Defendants purchased the business and not only the building and assets, we find no evidence to conclusively demonstrate that they knew that the franchisor was in Kansas. However, the Court does not find this lack of evidence determinative. The Mr. D's Defendants clearly knew that the business was under a franchise agreement at the time of the purchase, as Dyke testified to knowing of the Franchise Agreement, and the Purchase Agreement expressly referenced its existence. Interestingly, Dyke testified to certain provisions in the Purchase Agreement in detail, and testified that he extensively reviewed income generated from Goldenberg's operation of the business and reviewed Goldenberg's financial statements. Dyke further testified in detail regarding his due diligence investigation concerning the building and equipment purchased, describing how he searched for any potential liens and found none of record. Dyke's testimony, however, totally skipped over any details regarding the Franchise Agreement. Rather than conducting the same level of due diligence with regard to the franchise restrictions as he did with the building and other tangible assets, Dyke

---

[28]The Court finds that Goldenberg's testimony in its entirety lacked credibility, both because of the character of his oral testimony during the hearing and because during questioning by this Court he admitted, after attempts to be evasive, that statements he submitted to this Court in a sworn affidavit were false.

testified that he simply took Goldenberg's word that there were no conflicts with the Franchise Agreement. Dyke knew there was a franchise agreement, and because he is a sophisticated businessman, it would not be unreasonable for him to contemplate restrictions other than a right of first refusal in such a franchise. Due diligence would require him to investigate, or at least inquire, about any such restrictions. Dyke testified he made no such inquiries regarding the Franchise Agreement.

In addition to both Dyke's and Goldenberg's testimony, tracking the documents related to this sale strongly suggests that there has been an attempt at willful ignorance regarding this Franchise Agreement. Dyke did not assume that there were no prior liens on the building or machinery, nor did he take Goldenberg's word that any and all liens were discharged. Dyke also did not take Goldenberg's word on the income generated from the business, but instead, reviewed financial documents and sent an in-store representative to observe Goldenberg's cash flow. But when matters concerned the Franchise Agreement, Dyke took no action to verify anything, but simply relied on Goldenberg's representations that there were no issues, and removed contingencies based solely on those representations. Relying on such verbal representations, without either reviewing the relevant documents or conducting some level of inquiry prior to closing, is suspicious given Dyke's prior business experience. In fact, the evidence demonstrated that Dyke relied on Goldenberg's verbal representations only when it related to the Franchise Agreement. Moreover, the modifications made in the Purchase Agreement itself and the subsequent addendums indicate a deliberate attempt towards the end of the sale to place upon Goldenberg, who by his own representations appears to be practically judgment proof, all liability with respect to the Franchise Agreement.

The circumstances of this case clearly indicate that the Mr. D's Defendants took a "know nothing" approach to the Franchise Agreement, and the Court is convinced that the Mr. D's Defendants worked with the Goldenberg Defendants to complete this sale in such a manner as to intentionally avoid gaining any knowledge of the details included within the Franchise Agreement. Dyke, and thus the Mr. D's Defendants, may not have known the franchisor was in Kansas, but they clearly knew a franchise agreement existed and that the franchisor existed somewhere. The facts indicate the activities of Defendants were deliberately structured to allow the Mr. D's Defendants to have an appearance of ignorance on matters that in the normal course of business would have caused the typical buyer to make due inquiry. Based on the careful wording of the affidavits and careful structuring of the testimony presented, the Court is left with the strong impression that the Mr. D's Defendants knew more about the Franchise Agreement than they were willing to testify. Accordingly, based on the parties' concerted efforts in completing the sale, the Court concludes that the Mr. D's Defendants' conduct was purposefully directed to impact the franchisor where it was, that being the State of Kansas, and whether or not the Mr. D's Defendants knew specifically of that location is of no consequence to this analysis. The conduct was directed to the State of Kansas, and Plaintiff suffered injury in Kansas. Therefore, we find Plaintiff has met its burden of establishing that the Mr. D's Defendants have sufficient minimum contacts with the forum.

### b. *Reasonableness*

Having determined that the Mr. D's Defendants have sufficient minimum contacts with the forum, the Court next turns to whether asserting personal jurisdiction would offend "traditional notions of fair play and substantial justice."[29] This turns on whether it is reasonable for the Court

---

[29] *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945).

to exercise personal jurisdiction "in light of the circumstances surrounding the case."[30] As the "sliding scale" suggests, the reasonableness component may have a greater or lesser effect on the outcome of the due process inquiry depending on the extent of a defendant's minimum contacts.[31] However, when a non-resident defendant has purposefully directed activities toward the forum state, it must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[32] In this regard, the Court should consider: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.[33] If there is a strong showing of these reasonableness factors, jurisdiction may be established even though there are only minor minimum contacts.[34]

Regarding the first factor, Mr. D's is a Nevada limited liability company and is based in Nevada. Its only members are its two managing partners, Defendants Dyke and Edwards, who are also Nevada residents. The Mr. D's Defendants have indirectly identified one witness, a business broker located in Nevada that assisted with the transaction, that may testify in this matter. The

---

[30]*Pro Axess, Inc. v. Orlux Distrib'n, Inc.*, 428 F.3d 1270, 1279 (10th Cir. 2005); *OMI Holdings*, 149 F.3d at 1091.

[31]*OMI Holdings*, 149 F.3d at 1091-92.

[32]*Burger King*, 471 U.S. at 477.

[33]*World-Wide Volkswagen*, 444 U.S. at 292. "The process of resolving potentially conflicting fundamental social policies can usually be accommodated through choice-of-law rules rather than through outright preclusion of jurisdiction in one forum." *Burger King*, 471 U.S. at 483, n.26.

[34]*OMI Holdings*, 149 F.3d at 1095.

-13-

distance between them and the place of trial in Kansas City, Kansas will obviously impose a burden on the Mr. D's Defendants. However, because "defending a suit in a foreign jurisdiction is not as burdensome as in the past,"[35] the Court finds this factor weighs only slightly in the Mr. D's Defendants' favor.

Regarding the second factor, Plaintiff is a Kansas corporation with its principal place of business in Kansas. The subject matter of this action involves a franchise agreement that was executed in Kansas, albeit not by the Mr. D's Defendants,[36] but nonetheless involves them due to the nature of Plaintiff's claims. Kansas has a strong interest in enforcing its contracts and protecting its businesses, and in addition, the injury that Plaintiff suffered occurred in Kansas. As previously stated, the Mr. D's Defendants' arguments that the injury was suffered by Plaintiff in Nevada rather than at its corporate headquarters in Kansas is unpersuasive. Thus, Kansas has a strong interest in adjudicating this dispute.[37] This factor weighs strongly in favor of Plaintiff.

As to the third factor, Plaintiff's interest in receiving convenient and effective relief weighs in favor of jurisdiction in Kansas. As previously stated, Plaintiff's corporate headquarters is in Kansas. In addition, the Franchise Agreement at issue was executed in Kansas, and is governed by Kansas law. This factor weighs in Plaintiff's favor.

Concerning the fourth factor, the Court assesses whether Kansas would be the best state in which to litigate this dispute.[38] The key points to consider when evaluating this factor are (1) the

---

[35]*Cont'l Am. Corp. v. Camera Controls Corp.*, 692 F.2d 1309, 1314 (10th Cir. 1982).

[36]The Franchise Agreement was executed in Kansas by Defendant Goldenberg.

[37]*See Burger King*, 471 U.S. at 483-84.

[38]*OMI Holdings*, 149 F.3d at 1097.

-14-

location of witnesses, (2) the location of the wrong underlying the lawsuit, (3) what forum's law applies, and (4) "whether jurisdiction is necessary to prevent piecemeal litigation."[39] The first consideration favors neither party, as Plaintiff's witnesses are in Kansas and the Mr. D's Defendants' witnesses are in Nevada. Thus, this consideration is neutral. The second consideration weighs in favor of Plaintiff, as the cause of action arose in Kansas. Kansas courts follow the rule of *lex loci delecti*, or place of injury, to determine where the cause of injury occurred in a tort action,[40] and as previously stated, the alleged injury occurred to Plaintiff's corporate offices in Kansas. The third consideration weighs in favor of Plaintiff because the alleged injury occurred in Kansas, and involves a franchise agreement executed in Kansas, suggesting Kansas law applies.[41] The last consideration favors neither Plaintiff nor the Mr. D's Defendants, as the Court finds that the judicial system would be served by litigating the case in either Kansas or Nevada.

With respect to the fifth factor, the Court focuses on whether "the substantive social policy interests of other states or foreign nations" would be affected by exercising jurisdiction in Kansas.[42] Regardless of whether this action is litigated in Kansas or Nevada, the Court finds that neither state's social policy would be adversely affected. Plaintiff nor the Mr. D's Defendants argue that the outcome of this case could affect the policy interests of other states. Accordingly, this factor is neutral.

---

[39]*Id.*

[40]*Hawley v. Beech Aircraft Corp.*, 625 F.2d 991, 993 (10th Cir. 1980).

[41]*Dow Chem. Corp. v. Weevil-Cide Co.*, 630 F. Supp. 125, 127 (D. Kan. 1986) (stating that "[i]n a diversity action ... a federal court must apply the choice of law rules of the forum state."); *Kan. Mun. Gas Agency v. Vesta Energy Co.*, 840 F. Supp. 814, 822-23 (D. Kan. 1993) (stating that, in a tort case, the law of the state where the injury occurred should be applied). The Governing Law provision of the Franchise Agreement also states Kansas substantive law applies. Doc. 22-1, p.45 ¶ G.

[42]*OMI Holdings*, 149 F.3d at 1097.

After considering the above factors, the Court concludes that exercising personal jurisdiction over the Mr. D's Defendants is reasonable and will not offend "traditional notions of fair play and substantial justice" given the contacts discussed above compared to the relative weights of the reasonableness factors. Indeed, given that the Franchise Agreement clearly contemplated application of Kansas law in a Kansas forum, to conclude otherwise *would* likely offend traditional notions of fair play and substantial justice. Such a conclusion would allow a party to a contract to avoid the choice of forum provisions of the contract by hurriedly breaching the contract with non-residents, who kept willful ignorance of the underlying contract's provisions. The sanctity of contracts militates against such schemes. Accordingly, the Court finds that exercising personal jurisdiction over the Mr. D's Defendants is reasonable and proper. Therefore, their motion is denied.

**IT IS THEREFORE ORDERED** that Defendants Mr. D., LLC's, Richard Dyke's, and Yung Edwards' Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 18) is hereby DENIED.

**IT IS SO ORDERED.**

Dated this 24th day of June, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE